# JS-6

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| TALANA ORZECHOWSKI, | Case No.: SACV 12-01905-CJC(RNBx) |
| Plaintiff, | |
| vs. | MEMORANDUM OF DECISION |
| THE BOEING COMPANY NON-UNION LONG-TERM DISABILITY PLAN, Plan Number 625, an ERISA Plan; THE BOEING COMPANY; AETNA LIFE INSURANCE COMPANY, | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff Talana Orzechowski worked at Defendant The Boeing Company ("Boeing") until February 27, 2009. She applied for long-term disability ("LTD") benefits under Boeing's employee benefits plan, and her claim was initially granted by the plan's insurer and claims administrator, Aetna Life Insurance Company ("Aetna").

She then received LTD benefits from July 29, 2009 to July 28, 2011.  At the end of that period, however, Ms. Orzechowski's eligibility to receive further LTD benefits became subject to the plan's 24-month mental−nervous limitation and a different definition of disability.  Aetna accordingly requested additional medical records and physician peer reviews to determine Ms. Orzechowski's eligibility to receive further benefits, and on July 25, 2011 terminated Ms. Orzechowski's LTD benefits under the mental−nervous limitation.  Ms. Orzechowski submitted a timely administrative appeal, which Aetna denied.

Ms. Orzechowski brings this action under § 1132 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. § 1001 *et seq.*, challenging Aetna's decision to terminate her LTD benefits.  After a bench trial on the administrative record, the Court finds that Aetna did not abuse its discretion in denying Ms. Orzechowski's claim for additional benefits.

## II.  BACKGROUND

### A.  Plan Documents

Ms. Orzechowski's lawsuit stems from Aetna's termination of her LTD benefits under a benefits plan that Boeing offers to its non-union employees (the "Plan").[1]  The

---

[1]  The Plan comprises a principal Plan document — The Boeing Company Master Welfare Plan — as well as Governing Documents for each Component Benefit Program.  (AR 4589−616 ["Plan"] § 2.14 (definition of "Plan"); *see also* Plan at 1 ("No specific benefits are provided under this Plan document.  Rather, all welfare benefits are set forth in the underlying Governing Documents for the Component Benefit Programs.  Accordingly, all terms and provisions of each of the Component Benefit Programs . . . are incorporated herein by reference.").)  Governing Documents include, as relevant here, the summary plan description issued by Boeing, (AR 4486−581 ["SPD"]), and a certificate-of-insurance booklet issued by Aetna, (AR 0001−17 ["Certificate of Coverage"]).  (*See* Plan § 2.11 (definition of "Governing Documents").)  Notably, the Plan's definition of "Governing Documents" doesn't include Boeing's insurance policy with Aetna, (AR 0023−58 ["Policy"]; AR 0059−79 ["Rider"]).  (*See* Plan § 2.11.)

Plan provides that an employee is eligible to receive short-term disability benefits for a maximum period of 26 weeks.  (SPD at 2-3.)  If the employee continues to be disabled after 26 weeks, the employee may then receive LTD benefits.  (SPD at 3-2.)  Once the employee is no longer considered disabled, the employee's disability benefits end.  (*Id.* at 3-3.)  During the first 24 months of LTD coverage, an employee is considered disabled if the employee is "not able to perform the material duties of [the employee's] *own occupation*."  (Certificate of Coverage at 2 (emphasis altered).)  After this period, an employee is considered disabled if the employee is "not able to work at any *reasonable occupation* (this is any gainful activity for which [the employee is], or may reasonably become fitted by education training or experience)."  (*Id.* (emphasis altered).)  The Plan also has a mental−nervous limitation on coverage, whereby "[a] period of disability will end after 24 months if it is determined that the disability is primarily caused by a Mental Health or Psychiatric condition, including physical manifestations of these conditions, but excluding those conditions with demonstrable, structural brain damage."[2]  (*Id.* at 3.)

## B.  Initial Claim for LTD Benefits

Ms. Orzechowski became disabled on January 28, 2009.  (AR 1568.)  After she received short-term disability benefits for 26 weeks, Aetna approved her claim for LTD benefits under the "own occupation" definition of disability, and benefits were paid to Ms. Orzechowski from July 29, 2009 through July 28, 2011.  (AR 2186−88.)  At the end of that period, the definition of disability changed from the "own occupation" to the "any occupation" definition.  Accordingly, on August 10, 2010 — and again on October 8, 2010 and December 30, 2010 — Aetna sent Ms. Orzechowski letters notifying her of

---

[2]  The Plan provides exceptions to this limitation where at the end of the first 24 months the employee is confined to a hospital or treatment facility for treatment of the mental health or psychiatric condition.  (Certificate of Coverage at 3.)  These exceptions are inapplicable here.

the upcoming change in definition and requesting documentation and medical records to assist Aetna in determining her eligibility to receive LTD benefits beginning July 29, 2011.  (AR 1568−69, 1586, 1611.)  On January 21, 2011, Aetna advised Ms. Orzechowski that it had not received any response to its three earlier requests for updated forms, and that her LTD claim might terminate if Aetna did not receive those forms within 30 days.  (AR 1636.)

### C.  Medical Records Received by Aetna

In response to its latest request, Aetna received medical records prepared by several of Ms. Orzechowski's treating physicians over multiple years.  These records show, as one physician put it, "a very complex past medical history."  (AR 1756.) Many of the records were prepared by Ms. Orzechowski's primary treating physician, Neil F. Neimark, M.D., who has evaluated Ms. Orzechowski on nearly a monthly basis since January 2008.  (AR 2166.)  During these evaluations, Dr. Neimark frequently reported symptoms and behaviors that suggest Ms. Orzechowski had a disabling psychiatric condition.  On June 12, 2009, for example, Dr. Neimark noted that Ms. Orzechowski "overloaded her brain circuitry" by attempting to edit a book and was still exhibiting broken language and staccato speech with reversal of words.  (AR 2009.)  He also noted that, during these episodes, she would "gently pound her legs, head and shoulders with closed fists rapidly for a few seconds or minutes."  (*Id.*)

On August 4, 2009, Dr. Neimark noted that Ms. Orzechowski was "still extremely oversensitive to analytical, emotional stress" and "c[ould] go from fine to autistic" in two minutes.  (AR 2002.)  She was "[s]till running depressed, sometimes OCD" and was better at ignoring suicidal thoughts.  (*Id.*)  Dr. Neimark also recorded a family member's report that analytical thinking, especially evaluating a paper for spelling or grammar, would trigger "a disoriented, floaty, woozy feeling in head that

lasts seconds with autistic episodes, manic episodes and speech disorders." (*Id.*)  Dr. Neimark recorded several physical symptoms, including profuse sweating, muscle and nerve pains, and lung weakness.  (*Id.*)  He also noted "[s]ome episodes of neither leg working for a few hours for a few days," which he attributed to the effects of sedatives on muscle function.  (*Id.*)  On September 24, 2009, Dr. Neimark noted that Ms. Orzechowski had a "chatty, manic episode" and on October 21, 2009, he noted that she was in a "manic phase" with improved cognition and alertness.  (AR 1990, 1994.)

On August 19, 2010, Dr. Neimark noted that Ms. Orzechowski had experienced a stress-induced autistic episode for 20 minutes with rocking and self-hitting, and that "emotional stress [was] going directly into her body" and had caused her skin to emit a "gangrene type smell" and had caused a gastric bleeding episode.  (AR 1958.)  At another appointment, on September 16, 2010, Dr. Neimark reported that Ms. Orzechowski "[s]till thinks it's November 2007."  (AR 1954.)  On October 28, 2010, Dr. Neimark noted that Ms. Orzechowski had a "middle ground psychiatric breakdown" with "full on" visual and auditory hallucinations.  (AR 1994.)  He noted that she talked five days non-stop and had some manic episodes.  (*Id.*)

In addition to these symptoms, Dr. Neimark reported a wide range of physical ailments, including fatigue, headaches, tiredness, extended periods of sleeping, asthma, decreasing muscle tone, nausea, and muscle and nerve pain.  (AR 1954, 1966, 2002, 2006, 2288−89.)  According to Ms. Orzechowski's medical history as stated in each of Dr. Neimark's reports, in 2004 she was diagnosed with fibromyalgia and chronic fatigue syndrome.  (AR 2009.)  The medical history also states that she had been diagnosed before with heavy metal poisoning, adrenal fatigue, hypothyroidism, and other conditions, some controlled and some not.  (AR 2009−10.)  In a January 5, 2011 attending physician statement, Dr. Neimark stated that Ms. Orzechowski was diagnosed with chronic fatigue syndrome and listed objective clinical findings of memory

impairment, dermatitis, twitching, and wheezing.  (AR 1708−09.)  Dr. Neimark stated that Ms. Orzechowski's toxicity testing was "normal" and her labs remained "basically normal," but that her symptoms continued to worsen.  (*Id.*)

Aetna reviewed medical records from other physicians as well.  On October 23, 2009, Dan E. Silver, M.D., Neurologist, evaluated Ms. Orzechowski for "possible MS with a history of depression, difficulty with walking episodes, asthma, chronic fatigue syndrome, weakness, fatigue, and multiple other symptoms."  (AR 1809.)  Dr. Silver noted that there is no biomarker for fibromyalgia or for chronic fatigue syndrome.  He reported that Ms. Orzechowski was "obviously incapacitated to work" and recommended that her care be "predominantly handled by the psychiatrist."  (AR 1807.)

Scott Shoemaker, M.D., Neurologist, stated in a neurology consultation report dated October 27, 2009 that Ms. Orzechowski reported having "hundreds of neurological symptoms," as well as memory dysfunction and cognitive deficits for which she was seeing a psychiatrist regularly.  (AR 1756.)  He noted that Ms. Orzechowski was accompanied by her cousin, who according to Ms. Orzechowski was acting as Ms. Orzechowski's caretaker and "babysitter."  (*Id.*)  During the consultation, Ms. Orzechowski reported frustration that physicians in the past had indicated to her that her symptoms may be due to psychiatric causes.  (*Id.*)  She stated that she had seen a lot of neurologists who didn't know what was wrong with her, most of whom refused to schedule follow-up appointments with her.  (AR 1757.)  She also reported having eight or nine psychiatric diagnoses, some of which are clinically inconsistent with the others.  (*Id.*)  She reported many symptoms, including problems with her limbs "clubbing up," problems with "echolocation," sometimes being able to speak only in nouns, walking in circles without knowing it, and writing backwards.  (*Id.*)

//

Dr. Shoemaker noted that it was difficult to ascribe all of Ms. Orzechowski's symptoms to a single neurological diagnosis, but that he did "believe that [Ms. Orzechowski] ha[d] developed psychiatric issues and . . . that those psychiatric issues [we]re playing a role in the symptomatology." (AR 1760.) Dr. Shoemaker also noted that electrodiagnostic studies did not seem to show any peripheral neuropathy, myopathy, or any other definite peripheral nerve entrapment or injury. (*Id.*) He performed EMG/NCS testing to look for any neurological conditions that would explain Ms. Orzechowski's symptoms and examination findings, but the test results did not "reveal any definite objective evidence for any peripheral nervous system lesion or any myopathy." (AR 1764.) Dr. Shoemaker stated that he had not been able to identify any neurological etiology for Ms. Orzechowski's symptoms. (AR 1810.)

Barry L. Aaronson, Ph.D., Psychologist, noted in a Behavioral Health Clinician Statement completed on November 18, 2009 that Ms. Orzechowski exhibited severe mood disorder and apparent neurological problems affecting walking, talking, motor skills, and comprehension. (AR 1496−97.) He noted that her behavior was bizarre and abnormal. (AR 1496.) Dr. Aaronson observed variation in her cognition and speech during his examination of her: Ms. Orzechowski started the session cognitively impaired with speech problems and ended it coherent and articulate. (*Id.*) Dr. Aaronson also stated that Ms. Orzechowski exhibited manic behavior with slurred speech, stammering, and grammar that breaks down, and has suicidal ideation with no intention or means. (AR 1496−97.)

Michael Monroe, Ph.D., Psychologist, also evaluated Ms. Orzechowski. He noted in his initial evaluation that Ms. Orzechowski's thoughts included delusions and paranoia. (AR 1974.) Dr. Monroe's Psychologist Progress Notes for sessions from January 2010 to May 2010 state that she has depression and anxiety. (AR 1863−74.)

### D.  Aetna's Review and Decision to Terminate Benefits

In addition to reviewing Ms. Orzechowski's medical records, Aetna requested peer reviews from board-certified physicians specializing in psychiatry and neurology — Mark Schroeder, M.D., Psychiatry, and Andrew Gordon, M.D., Neurology.  (AR 2143, 2155.)  In conducting the peer reviews, Dr. Schroeder and Dr. Gordon each reviewed the claim file and made several attempts to speak directly with Dr. Neimark, Dr. Monroe, and Dr. Aaronson.  (AR 2149−50, 2158.)  Dr. Schroeder received a voicemail message from Dr. Aaronson in which Dr. Aaronson stated that he was uncertain as to what degree psychological factors affected Ms. Orzechowski's physical symptoms, but that there was generally a "psychological overlay" in chronic-pain patients.  (AR 2150.)  None of Ms. Orzechowski's attending physicians returned Dr. Gordon's calls.  (AR 2158.)

Dr. Schroeder stated in his review that the medical records described serious psychiatric findings throughout the time frame in question, including mood swings, depression, manic and hypomanic episodes, obsessive cleaning, self-harm, rocking behaviors, excessive sleep, suicidal thoughts, panic attacks, hallucinations, paranoia, tangential thought, lethargy, inappropriate jocularity, and pressured speech.  (AR 2151.)  Based on his review of the available medical records, Dr. Schroeder concluded that

> th[e] clinical information adequately supported psychiatric impairment in ability to: complete tasks without interruption by psychiatric symptoms; perform normal daily activities independently; perceive reality; sustain attention and concentration or learn and process information; interact appropriately with others; use appropriate judgment; and adapt to even minor stressors productively and without worsening of symptoms.

(*Id.*)  He further concluded that he expected Ms. Orzechowski's level of psychiatric impairment to preclude her from reliably and safely performing even simple, routine work duties.  (*Id.*)

Dr. Gordon, in his neurology peer review, noted that Ms. Orzechowski's claim file showed reported symptoms of fatigue, depression, memory impairment, excessive sleep, speech difficulties, loss of depth perception, loss of motor strength, and deteriorating motor and cognitive skills.  (AR 2156.)  He nevertheless concluded that there was no evidence of a neurological disorder that would preclude Ms. Orzechowski from performing the duties of her own light occupation.  (AR 2158.)  In particular, he noted that all of the tests that had been conducted — including three MRIs of the brain, a Transcranial Doppler test, a Nerve Conduction test, a Visual Evoked Response study, and an Electroencephalography — returned negative or unremarkable results.  (AR 2159.)  Moreover, he noted that there were no significant motor deficits noted, and there was no ataxia or cognitive impairment documented.  (*Id.*)

On June 7, 2011, Aetna provided Dr. Gordon's peer evaluation to Dr. Neimark, Dr. Aaronson, and Dr. Monroe and invited them to provide any observations, diagnoses, or therapies that support disagreement with Dr. Gordon's conclusion that, from a neurological standpoint, Ms. Orzechowski was capable of performing her own light occupation.  (AR 2164.)  Dr. Neimark informed Aetna of his disagreement the next day, stating his opinion that Ms. Orzechowski was neurologically and functionally impaired despite Dr. Gordon's failure to find evidence of any disorder.  (AR 2166.)  He further stated that "a simple common sense review of the multiple historic findings detailed thoroughly in my monthly hour long evaluations of the patient would make it quite clear that this patient is not able to perform any level of work."  (*Id.*)

After receiving Dr. Neimark's formal disagreement, Aetna asked Dr. Gordon to prepare an addendum to his initial peer review.  (AR 2178.)   In performing the addendum review, Dr. Gordon conducted peer-to-peer conferences with Dr. Shoemaker and Dr. Neimark.  In Dr. Gordon's conference with Dr. Shoemaker, Dr. Shoemaker stated that he was one of many neurologists who evaluated Ms. Orzechowski and that to

the best of his knowledge none of the neurologists identified evidence of neurological disorder.  (AR 2181.)  Dr. Shoemaker also stated that he found no deficits such as motor impairment spasticity, gait ataxia, or dementia.  (*Id.*)  The two doctors discussed Dr. Neimark's recent letter, and Dr. Shoemaker stated that Ms. Orzechowski's symptoms, including the symptoms reported in Dr. Neimark's letter, were likely related to a psychiatric disorder.  (*Id.*)

In Dr. Gordon's peer-to-peer conference with Dr. Neimark, Dr. Neimark acknowledged that multiple neurologists had evaluated Ms. Orzechowski and had not found a neurological disorder.  (*Id.*)  Dr. Neimark noted Ms. Orzechowski's difficulties with concentration, memory, sleepiness, and balance and expressed to Dr. Gordon his belief that "there is something not yet identified in the claimant's work up, and . . . it could be neurologic or psychiatric."  (*Id.*)  After consulting with Dr. Neimark and Dr. Shoemaker, Dr. Gordon reaffirmed his earlier conclusions.  In his addendum peer review issued on July 18, 2011, he found no neurologic or diagnostic findings to support that Ms. Orzechowski was functionally impaired from a neurological perspective.  (AR 2181−83.)

On July 25, 2011, Aetna notified Ms. Orzechowski of its decision to terminate payment of her LTD benefits based on its determination that her disability was caused by a mental condition.  (AR 2186.)  The denial letter explained that the medical data in her claim file supports that she was disabled due to depressive disorder and mood disorder, which fall under the Plan's 24-month mental−nervous limitation.  (AR 2187.)  The letter acknowledged Ms. Orzechowski's reported conditions of chronic fatigue syndrome and toxic effect of mercury, but noted that consultants specializing in psychiatry and neurology had reviewed her records and had found evidence of impairment based on a mental condition, but had not found impairment based on a neurological condition.  (*Id.*)  Aetna advised Ms. Orzechowski that, should she request a

review of Aetna's decision, "it would be helpful for [her] to submit any information . . . that supports that [she] remain[s] disabled as a result of a physical condition."  (AR 2188.)

### E.  Appeal of Aetna's Decision

Ms. Orzechowski's attorney submitted an appeal of Aetna's denial on August 30, 2011, asserting that Ms. Orzechowski met the any occupation definition of disability and that the mental−nervous limitation should not apply to her claim for ongoing benefits.  (AR 2199−200.)

### 1.  Additional Medical Records Received by Aetna

After granting four requests to Ms. Orzechowski's attorney for additional time to submit medical documentation, Aetna received additional medical records.  These records included records from Dr. Neimark as well as other treating physicians.  On April 21, 2011, Dr. Neimark noted that Ms. Orzechowski could not find one hand with the other if her eyes were closed.  (AR 2290.)  He also noted that she had tried an assisted living facility, but left after the facility reportedly mishandled her medications and failed to adhere to her dietary restrictions.  (*Id.*)  On July 22, 2011, Ms. Orzechowski saw Dr. Neimark with a complaint of fatigue and her skin condition, and Dr. Neimark noted that Ms. Orzechowski was functionally disabled and that her overall condition seemed to have stabilized, with no improvement but no obvious decline.  (AR 2312.)  On June 24, 2011, Dr. Neimark noted that Ms. Orzechowski had trouble distinguishing reality from non-reality, especially dream memories.  (AR 2303.)

On August 19, 2011, Dr. Neimark saw Ms. Orzechowski and reported that she had been getting more than usual migraines and her nausea had worsened.  (AR 2316.)

Dr. Neimark prescribed Hydrocortisone and stated, "In my medical opinion, you do not have any mental illness or substance abuse." (*Id.*)  On September 30, 2011, Ms. Orzechowski reported heart pains and pressure; she also reported that she had been "crashing" physically.  (AR 2317.)  Dr. Neimark reported that her heart pains were exacerbated by stress.  (*Id.*)  On October 27, 2011, Dr. Neimark completed a Fatigue Questionnaire in which he diagnosed Ms. Orzechowski with adrenal disorder, chronic fatigue syndrome, disorders of mitochondrial metabolism, HTN, hypothyroidism, inflammatory polyarthropathy, and intestinal malabsorption.  (AR 2402.)

Ms. Orzechowski was also seen by Wesley Elon Fleming, M.D., at Sleep Center of Orange County for her problems with breathing, wheezing, and oxygen issues.  Dr. Fleming conducted a physical examination of Ms. Orzechowski and found that she had a "low-lying soft palate grade 4 and a narrow airway." (AR 2379.)  He also noted that "[c]erebellar examination was inconsistent and possibly not genuine on finger to nose testing." (*Id.*)  Ms. Orzechowski underwent a Split-Night Polysomnogram at the center. Dr. Fleming recorded that "[t]he diagnostic portion of this sleep study demonstrated severe obstructive sleep apnea, associated with loud snoring and hypoxemia." (AR 2381.)  Dr. Fleming later noted that Ms. Orzechowski's sleep apnea had apparently resolved on CPAP therapy.  (AR 2373, 2387.)

On March 7, 2012, Ms. Orzechowski was seen by Harriet T. Cokely, M.D., for a neurologic evaluation.  Dr. Cokely reported Ms. Orzechowski was "clearly cushingoid probably as a result of her prescribed medication." (AR 2717.)  She further noted that "[t]he episodes as she describes of seizure are not organic seizures, but non-epileptic episodes and these are generally due to psychological features." (*Id.*)  "Based upon the history," she recorded, "it is unlikely that there is any underlying organic neurologic issue." (*Id.*)

On April 13, 2012, Dr. Aaronson recorded his opinion that Ms. Orzechowski's depression and anxiety symptoms were secondary to her medical problems.  (AR 2736.) He stated that he was not qualified to say if the depression and anxiety were the result of chronic fatigue syndrome or some other medical problem.  (*Id.*)

## 2.  Aetna's Review and Denial of Appeal

On May 21, 2012, Aetna requested a third physician peer review, this time from Donald Lee, D.O., Occupational Medicine.  (AR 4452.)  Dr. Lee reviewed the claim file and made several unsuccessful attempts to speak with Dr. Neimark and Dr. Shoemaker. (AR 4456.)  Dr. Lee concluded, based on his review of the medical record, that Ms. Orzechowski had no functional impairment that would preclude her ability to perform any reasonable occupation for the time period from July 29, 2011 through May 31, 2012.  (AR 4457.)  Dr. Lee noted the various examinations and tests that had been performed on Ms. Orzechowski:

> Physical exam findings by Dr. Shoemaker are essentially normal except that the claimant's affect is highly labile with inappropriate jocularity and speech is pressured.  She had an MRI scan of the brain performed on 02/20/2009 that showed mild nonspecific prominence of the cortical sulci with no interval change when compared to study of 04/01/2008.  She had EMG/NCV studies that Dr. Shoemaker indicated did not demonstrate any peripheral neuropathy, myopathy, or any other definite peripheral nerve entrapment or injury.

(*Id.*)  Dr. Lee also noted that Dr. Neimark had suggested a biochemical deficit from a functional medicine perspective, but that Dr. Neimark had failed to support his opinion with biochemical abnormality in the provided test results and records.  (*Id.*)

After Aetna provided Dr. Lee's peer review to Dr. Neimark and Dr. Shoemaker, Dr. Neimark informed Aetna of his disagreement in a letter dated June 7, 2012, stating that Plaintiff was incapable of working because her adrenal dysfunction and dependence

on hydrocortisone caused extreme fatigue.  (AR 4461.)  Dr. Lee then completed an addendum peer review, at Aetna's request.  Dr. Lee concluded, based on the records previously reviewed and Dr. Neimark's June 7, 2012 letter, that Ms. Orzechowski had no functional impairment that would preclude her ability to perform any reasonable occupation for the relevant time period.  (AR 4468.)  He stated that Dr. Neimark's June 7, 2012 letter did not change his assessment because Dr. Neimark did not provide any substantiating physical or diagnostic findings to support his opinion.  (AR 4468−69.)

On June 20, 2012, Aetna advised Ms. Orzechowski that it had assessed her appeal and had determined to uphold its decision to terminate her LTD benefits.  (AR 4483−85.)  In its letter to Ms. Orzechowski, Aetna described Dr. Lee's peer review and Dr. Lee's efforts to consult Dr. Neimark and Dr. Shoemaker.  Aetna also noted Dr. Neimark's formal disagreement with Dr. Lee's review, but stated that Dr. Neimark's response did not include any physical or diagnostic findings to substantiate his opinion that physical conditions prevented Ms. Orzechowski from performing any reasonable occupation.  (AR 4484.)

## III.  Standard of Review

The parties dispute which standard of review the Court must apply.  In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held that district courts reviewing denials of benefits under ERISA must apply one of two standards of review, depending on the language of the plan at issue.  The default standard for a denial of benefits challenged under § 1132(a)(1)(b) is *de novo* review.  *Firestone*, 489 U.S. at 115.  If, however, the "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the decision to deny benefits and the interpretation of the plan are reviewed for abuse of discretion.  *Id*.  In order for a plan to alter the standard of review from *de*

*novo* to abuse of discretion, "the plan must unambiguously provide discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc)).

The benefits plan at issue in this case clearly gives the administrator discretionary authority to determine eligibility to receive benefits:

> The Plan Administrator has *full discretionary authority to determine all questions that may arise* including all questions relating to the eligibility of Employees and Dependents to participate in the Plan and the amount of benefits to which any Participant or Dependent may become entitled, and benefits under this Plan will be payable to a Participant or Dependent only if the Plan Administrator determines in its discretion that the Participant or Dependent is entitled to them.

(Plan § 4.1(a) (emphasis added).)  Under both the Plan and the Summary Plan Description ("SPD"), the Plan Administrator may delegate this discretionary authority to a "services representative" such as Aetna, so long as the Plan Administrator does so "in writing, approved by majority vote."  (*Id.* § 4.3; AR 4569.)

Ms. Orzechowski contends that the *de novo* standard applies because any grant of discretionary authority contained in the Plan was rendered void by recently enacted California Insurance Code section 10110.6.  The Court disagrees.  Section 10110.6 doesn't apply retroactively, and the Plan here was last issued or renewed a year before the statute became effective.  *Cf. Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 867 (9th Cir. 2008) ("Assuming that the Commissioner may prohibit insurance companies from using this discretionary clause in future insurance contracts, he cannot rewrite existing contracts so as to change the rights and duties thereunder.").

Section 10110.6 states in relevant part:

(a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.

(b) For purposes of this section, "renewed" means continued in force on or after the policy's anniversary date.

(c) For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that, in turn, could lead to a deferential standard of review by any reviewing court.

. . . .

(g) This section is self-executing. If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

The section's effective date is January 1, 2012. The statute thus only applies to insurance policies, contracts, certificates, and agreements that were "offered, issued, delivered, or renewed" after that date. *See* Cal. Ins. Code § 10110.6. Here, however, the Plan was last amended and restated on January 1, 2011. (AR 4589−616 ["Plan"].) There is no evidence that the Plan has been renewed since then.[3] Indeed, Ms. Orzechowski concedes that the Plan's effective date is January 1, 2011. (*See* Dkt. No. 21 ["Pl.'s Opening Br."] at 11 ("[T]he most recent Master Welfare Plan in the Record [is] effective January 1, 2011.").) Thus, even if section 10110.6 applies to benefits

//

---

[3] Unlike insurance policies, which automatically renew on an annual basis, *see* Cal. Ins. Code § 10110.6(b), the benefits plan here doesn't automatically renew, either by its own terms or by operation of law.

plans that issue after the statute's effective date,[4] it has no application to preexisting benefits plans, such as the Plan here.  Accordingly, the statute doesn't render any provision of the Plan void.

Ms. Orzechowski further argues that section 10110.6 invalidates a provision of Boeing's insurance policy with Aetna that gives discretion to Aetna.[5]  (Dkt. No. 24 [Pl.'s Reply"] at 1−2.)  She argues that because section 10110.6 applies to the insurance

---

[4]  Defendants contend that the Insurance Code "has no relevance or applicability to the SPD or The Master Welfare Plan" because those documents "exist independently of any purchased insurance policy" and because Boeing "is obligated to provide its employees with the benefits provided for in The Master Welfare Plan and summarized in the SPD regardless of whether it opts to insure those benefits." (Dkt. No. 25 ["Defs.' Reply"] at 5.)  The Court doubts that this argument is entirely correct.  Section 10110.6 of the Insurance Code covers not only "policies" that "provide" disability insurance coverage but also "contracts" and "agreements" that "fund" such coverage.  *See* Cal. Ins. Code § 10110.6(a).  And while it may be true as Defendants say that the Master Welfare Plan is silent as to whether benefits are insured, the governing documents for the Plan's long-term-disability benefit program make clear that the Plan is an agreement to fund disability insurance coverage.  For example, the SPD states that Boeing "*provides basic long-term disability coverage at no cost* to [employees]" and that it "has contracted a service representative to provide insurance coverage and handle the day-to-day administration of this plan." (AR 4515 (emphasis added).)  The SPD is defined by the Plan as a "Governing Document" and, therefore, is part of the Plan.  (*See* Plan §§ 2.11, 2.14 (" 'Plan' means The Boeing Company Master Welfare Plan, including any corresponding Governing Document.").)  The Plan also incorporates "the applicable certificate of insurance booklets issued by an insurance company." (*See id.* § 2.11.)  The relevant booklet issued by Aetna here provides that "[the] Plan is underwritten by [Aetna]." (AR 0003.)  In the Court's view, this plain language in the SPD and the certificate-of-insurance booklet leaves little doubt that the Plan is an agreement to fund disability insurance coverage.  But the Court need not conclusively determine the issue.  Defendants' argument here is moot because 10110.6 is not applicable to the Plan for the separate reason that the Plan was not issued or renewed after the statute's effective date.

[5]  The insurance policy provides:

> For the purposes of section 503 of [ERISA], Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy.  In exercising such fiduciary responsibility, Aetna shall have discretionary authority to:
>
> > Determine whether and to what extent employees and beneficiaries are entitled to benefits; and
> >
> > Construe any disputed or doubtful terms of this policy.
>
> Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily or capriciously.

(AR 0058.)

policy, the Court must review under the *de novo* standard.  (*Id.*)  This argument is unavailing, however, as it incorrectly assumes that the striking of language from an insurance policy trumps the unstricken language of the Plan.  Ms. Orzechowski is suing under ERISA for denial of benefits under the *Plan*; she is not suing for breach of the Aetna *insurance policy*.  And, while it may be true that the insurance policy is covered by section 10110.6, Aetna's discretionary authority ultimately derives from the Plan, not the insurance policy.  Indeed, the policy's language granting discretion to Aetna would have been ineffectual without a separate, formal delegation of such authority, as the Plan requires.  (*See* Plan § 4.3 (Plan Administrator's discretionary authority under the Plan may only be delegated "in writing, approved by majority vote").)

In sum, the Plan's language unambiguously provides discretion to Aetna, and that language is not made void by California law.  Accordingly, the Court reviews the denial of Ms. Orzechowski's LTD benefits under the more deferential abuse-of-discretion standard.[6]

# IV.  ANALYSIS

Under the "deferential" abuse-of-discretion standard, "a plan administrator's decision will not be disturbed if reasonable.  This reasonableness standard requires

---

[6]  Two other district courts have reached an arguably contrary conclusion on similar facts.  *See Gonda v. Permanente Med. Grp., Inc.*, No. 11-1363 SC, 2014 WL 186354 (N.D. Cal. Jan. 16, 2014); *Polnicky v. Liberty Life Assurance Co. of Boston*, No. C 13-1478 SI, 2013 WL 6071997 (N.D. Cal. Nov. 18, 2013).  Both courts reason that because the applicable insurance policies in those cases automatically renewed after section 10110.6 became effective, the discretionary language in those policies was void, thus requiring review under the *de novo* standard.  Neither opinion, however, appears to separately focus on the language or the effective dates of the relevant benefits plans.  To the extent the benefits plans in those cases granted discretionary authority and were not issued or renewed after January 1, 2012, the Court respectfully disagrees with those decisions.  As explained above, because this case is brought under the Plan, not the insurance policy, and because the insurer's discretionary authority derives from the Plan, not the insurance policy, the Court looks to the Plan to determine the appropriate standard of review.

deference to the administrator's benefits decision unless it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (internal quotation marks and citations omitted).

In *Firestone*, the Supreme Court recognized that there are situations where a plan administrator or fiduciary that has discretion under the plan is operating under a conflict of interest. 489 U.S. at 115. When an insurer acts as both the plan fiduciary and the funding source for benefits, an inherent structural conflict of interest exists. *Abatie*, 458 F.3d at 965 (citing *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999)). The presence of a conflict of interest merely contributes to the district court's decision of "how much or how little to credit the plan administrator's reason for denying insurance coverage." *Id.* at 968. If a structural conflict is unaccompanied by evidence of "malice, of self-dealing, or of a parsimonious claims-granting history," its effect on the district court's analysis may be slight. *Id.* If, however, "the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record," the district court may weigh the presence of a conflict more heavily. *Id.* at 968–69 (internal citations omitted).

Even if the plan presents these more serious conflicts, the standard of review remains abuse of discretion. *Id.* 968–69. "[T]he existence of a conflict [is] a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009). Additional factors to be considered in determining whether a plan administrator or fiduciary abused its discretion include "the quality and quantity of the medical evidence,

whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any." *Id*. (internal quotation marks omitted).

## A.  Conflict of Interest

Because Aetna here has a conflict of interest — as it is both the plan fiduciary and funding source for benefits under the Plan — the Court reviews Aetna's decision to terminate benefits with elevated scrutiny.  For several reasons, however, the effect of Aetna's conflict on the Court's analysis is only slight.  *See Abatie*, 458 F.3d at 968.  Ms. Orzechowski has offered no evidence "of malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at 968.

To the contrary, the record shows that Aetna conducted a thorough, good-faith review of Ms. Orzechowski's claim.  It requested peer reviews from board-certified specialists in psychiatry, neurology, and occupational medicine.  Each of these reviewing physicians conducted a full review of the medical record and made several attempts to confer with Ms. Orzechowski's treating physicians.  Aetna then forwarded each peer review to Ms. Orzechowski's treating physicians and requested responses. When it received responses, Aetna asked the reviewing physicians to prepare an addendum peer review, which the reviewing physicians did after conducting peer-to-peer conferences with Ms. Orzechowski's treating physicians.  The Court finds no evidence that Aetna ever withheld information or records from any of the reviewing physicians.  And, on several occasions, Aetna allowed Ms. Orzechowski additional time to produce medical records.  The record shows, too, that Aetna considered a contrary Social Security Administration ("SSA") disability determination, but was provided with

neither the basis nor the evidence that was relied on for the SSA determination.  (AR 4484−85.)  Finally, while Aetna didn't require a physical examination by a non-treating physician, doing so wasn't necessary because Aetna's reviewing physicians were given Ms. Orzechowski's complete medical records and even conferred directly with Ms. Orzechowski's treating physicians.  *Cf. Montour*, 588 F.3d at 634 (finding that the insurer's failure to conduct an in-person medical evaluation raised questions as to the reliability of the insurer's decision where it was not clear that the insurer presented the reviewing physicians with all relevant evidence).

In sum, the Court finds no evidence that Aetna's conflict improperly influenced its decision or its handling of Ms. Orzechowski's claim.  Nevertheless, the Court considers Aetna's conflict, as well as the fact that Aetna did not require a physical examination by a non-treating physician, in its analysis whether Aetna abused its discretion.

**B.  Reasonableness of Aetna's Decision to Terminate Benefits**

Aetna's decision to terminate Ms. Orzechowski's LTD benefits under the Plan's mental−nervous limitation was reasonable and based on substantial evidence in the record.  Throughout the relevant time frame, Ms. Orzechowski's treating physicians have documented oft-recurring symptoms and behavior that suggest psychiatric impairment, including mood swings, depression, manic and hypomanic episodes, obsessive cleaning, self-harm, rocking behaviors, excessive sleep, suicidal thoughts, panic attacks, hallucinations, paranoia, tangential thought, lethargy, inappropriate jocularity, and pressured speech.  (*See, e.g.*, AR 1954, 1958, 1990, 1994, 2002, 2009.) Dr. Shoemaker, one of Ms. Orzechowski's treating neurologists, was unable to identify any neurological etiology for her symptoms, but stated in a peer-to-peer conference with Dr. Gordon that her physical symptoms were likely related to a psychiatric disorder.

(AR 1760, 1810, 2181.)  Dr. Silver, another treating neurologist, reported that Ms. Orzechowski was "obviously incapacitated to work" and recommended that her care be predominantly handled by a psychiatrist.  Dr. Monroe, a psychologist, diagnosed Ms. Orzechowski with depression and anxiety.  (AR 1863−74.)  After reviewing Ms. Orzechowski's medical records, Dr. Schroeder, a board-certified physician specializing in psychiatry, concluded that the available clinical information supported psychiatric impairment so severe as to preclude Ms. Orzechowski from reliably and safely performing even simple, routine work duties.  (AR 2151.)

    In contrast to the significant evidence of psychiatric impairment, Ms. Orzechowski's neurologists have not identified any neurological disorder.  Dr. Shoemaker performed various tests and did not find any neurological etiology for Ms. Orzechowski's symptoms.  (AR 1810.)  Dr. Shoemaker also noted to Dr. Gordon that he was one of many neurologists who evaluated Ms. Orzechowski and that, to the best of his knowledge, none of the neurologists identified evidence of neurological disorder.  (AR 2181.)  Dr. Shoemaker also stated that he found no deficits such as motor impairment spasticity, gait ataxia, or dementia.  (*Id.*)  Numerous neurologic and diagnostic tests have been conducted on Ms. Orzechowski — including three MRIs of the brain, a Transcranial Doppler test, a Nerve Conduction test, a Visual Evoked Response study, and an Electroencephalography.  (AR 2159.)  Each of these tests returned negative or unremarkable results.  (*Id.*)  On the basis of these findings and after peer-to-peer conferences with both Dr. Neimark and Dr. Shoemaker, Dr. Gordon, a board-certified neurologist, concluded that no neurological or diagnostic findings support that Ms. Orzechowski was functionally impaired from a neurological perspective.  (AR 2181−83.)

    Considering all of this evidence together, the Court finds that Aetna did not abuse its discretion in deciding to terminate Ms. Orzechowski's benefits.  The Court cannot

say that Aetna's decision was illogical, implausible, or unsupported by facts in the record.

Ms. Orzechowski's arguments to the contrary fail to persuade otherwise. First, she argues that Aetna improperly required her to support her claim with objective evidence. But the record shows that Aetna considered all available evidence — both objective and subjective — in reaching its decision. Aetna's July 25, 2011 letter to Ms. Orzechowski shows that Aetna understood that Ms. Orzechowski complained of pain and fatigue and considered this information in analyzing the claim. (AR 2186−87.) And while Aetna did note the lack of objective evidence of any physical condition, its analysis didn't stop there. Aetna thoroughly reviewed the entire record, and concluded based on that review that substantial, positive evidence in the record suggested Ms. Orzechowski was disabled by a psychiatric condition. Thus, "[w]hile the lack of objective evidence played an important part in the decision, the record does not demonstrate that [Aetna] improperly demanded objective evidence without informing [Ms. Orzechowski] or that it altered the requirements of the Plan." *Safavi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1118 (C.D. Cal. 2007).

Ms. Orzechowski also points to statements in the medical record by her treating physicians that show, she says, that her disability is caused by a physical condition. For example, she notes that Dr. Aaronson gave an opinion that her condition is primarily physical in nature. (Pl.'s Opening Br. at 24.) Dr. Aaronson reported, "I would agree . . . that Ms. Orzechowski's cognitive problems and depression stem primarily from her severe health problems. I am not qualified to say if they are the result of chronic fatigue syndrome or some other medical problem." (AR 2736.) Dr. Aaronson further stated, "In summary, I believe Ms. Orzechowski's depression and anxiety symptoms are secondary to her medical problems." (*Id.*) Dr. Neimark has also diagnosed Ms. Orzechowski with adrenal disorder, chronic fatigue syndrome, disorders of

mitochondrial metabolism, HTN, hypothyroidism, inflammatory polyarthropathy, and intestinal malabsorption.  (AR 2402.)  Dr. Neimark has also stated, "In my medical opinion, [Ms. Orzechowski] do[es] not have any mental illness or substance abuse." (AR 2316.)

But these findings must be considered in the context of the whole record, which contains substantial evidence suggesting that Ms. Orzechowski's psychiatric problems have gone well beyond "depression and anxiety symptoms."  Dr. Neimark has recorded instances of visual and auditory hallucinations, delusions, self-hitting behavior, manic episodes, talking non-stop for multiple consecutive days, and a "middle ground psychiatric breakdown."  (AR 1954, 1958, 1990, 1994, 2002.)  So while it may be true that there generally is a "psychological overlay" in chronic-pain patients, (AR 2150), the frequency and severity of Ms. Orzechowski's mental-health problems are nonetheless very significant facts in the record from which Aetna may reasonably infer that Ms. Orzechowski's physical ailments were either secondary to or caused by her psychiatric condition.[7]  Notably, nowhere in the record does any physician, including Dr. Aaronson, express an opinion that Ms. Orzechowski's hallucinations or self-hitting are caused by a physical condition such as fibromyalgia.

Moreover, the administrator of an ERISA plan is under no obligation to give deferential weight to the findings of a claimant's treating physician.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  "[C]ourts have no warrant to

---

[7]  These facts make this case very different from *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794 (9th Cir. 1997), upon which Ms. Orzechowski relies. In *Lang*, the Ninth Circuit noted that fibromyalgia, a type of muscular or soft-tissue rheumatism, may be "accompanied by fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression."  *Id.* at 796 (citing *Fibromyalgia*, Arthritis Foundation Pamphlet at 1, 5 (1992)).  The court also noted that "[t]he depression and anxiety associated with fibromyalgia are believed to be symptoms of this muscular disease, rather than causes of it."  *Id.*  As explained above, however, the record in this case suggests that Ms. Orzechowski suffers from a more severe psychiatric impairment that involves much more than anxiety and depression.

require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* Here, substantial, reliable evidence shows that Aetna thoroughly reviewed and considered the findings of Ms. Orzechowski's treating physicians, including Dr. Neimark and Dr. Aaronson. In fact, Aetna's reviewing physicians received direct feedback from both of them. Under the Plan, so long As Aetna's decision is not illogical, implausible, or unsupported in inferences that may be drawn from the facts in the record, it has discretion to decide whether to agree with her treating physicians' opinions.

Ms. Orzechowski further contends that Aetna's decision to terminate her LTD benefits on the basis of the mental−nervous limitation is inconsistent with its decision to originally grant her such benefits. In particular, she notes that when her claim was first granted, Aetna failed to advise her that the claim was granted under the mental−nervous limitation. (Pl.'s Opening Br. at 22.) Ms. Orzechowski also notes that Aetna relied on a medical report by Elana Mendelssohn, Psy.D., that "should be found to support disability based upon a 'constellation' of problems including fibromyalgia and chronic fatigue syndrome, which would not fall under the mental 24 month limit." (*Id.*)

But there is no inconsistency. As to fibromyalgia and chronic fatigue syndrome, Dr. Mendelssohn only stated that "there is a *noted history* of multiple medicaol [*sic*] conditions, particularly including fibromyalgia and chronic fatigue syndrome." (AR 1364 (emphasis added).) This "noted history" may have simply been the medical history recorded in each of Dr. Neimark's reports, which states that Ms. Orzechowski was diagnosed with fibromyalgia and chronic fatigue syndrome in 2004. (*See, e.g.*, AR 2009.) Also, because the 24-month mental−nervous limitation did not apply at the time Aetna first granted Ms. Orzechowski's claim, Aetna had no need to determine whether

the disability was primarily caused by a physical or a mental condition.  And in any event, Dr. Mendelssohn based her conclusion in significant part on Ms. Orzechowski's psychiatric status.  Dr. Mendelssohn concluded:

> Overall, it is my opinion that *the provided clinical information documents unstable psychiatric status* in addition to cognitive impairment, particularly in terms of verbal memory and complex attention.  Due to the constellation of these factors, it is my opinion the information supports the presence of a functional impairment from 01/28/09 through the present.

(AR 1364 (emphasis added).)  Dr. Mendelssohn's report therefore supports, not undermines, Aetna's determination that the mental−nervous limitation applies.

# V.  CONCLUSION

In sum, Aetna's decision to terminate Ms. Orzechowski's LTD benefits was supported by substantial evidence in the record and was not an abuse of discretion. Accordingly, the Court affirms Aetna's termination of disability benefits.

DATED:      March 12, 2014

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE